UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **JASON MEADOR,**<br>    **Plaintiff** | **CIVIL ACTION** |
| **VERSUS** | **NO. 19-2378** |
| **STARR INDEMNITY & LIABILITY INSURANCE COMPANY,**<br>    **Defendant** | **SECTION: "E" (3)** |

### ORDER AND REASONS

Before the Court is Plaintiff Jason Meador's Motion in Limine to Exclude and/or Limit the Testimony of Defendant's accident reconstruction expert witness, Robert Rucoba.[1] Starr Indemnity & Liability Insurance Company ("Starr Indemnity") opposes the motion.[2] For the reasons that follow, the motion is **GRANTED IN PART** and **DENIED IN PART**.

### BACKGROUND

Plaintiff Jason Meador alleges that on or about June 25, 2018, Plaintiff was operating a truck owned by his employer, Gunite Express, LP ("Gunite"), when "suddenly and without warning" an unknown driver pulled in front of him, "causing the vehicle driven by [Plaintiff] to flip and eject [Plaintiff] from the driver's seat."[3] As a result of the accident, Plaintiff suffered various bodily injuries.[4] Plaintiff alleges Starr Indemnity

---

[1] R. Doc. 74. Plaintiff's request for oral argument on the Motion in Limine and for the opportunity to present live testimony at that hearing is **DENIED**. R. Doc. 79. A district court is not required to hold a formal *Daubert* hearing, even when requested. Rather, a district court must perform some type of *Daubert* inquiry and articulate its basis for admitting or denying expert testimony. The Court finds it has the evidence and arguments necessary to decide the Motion in Limine without the need for oral argument or live testimony. *See, e.g., Carlson v. Bioremedi Therapeutic Sys., Inc.*, 822 F.3d 194 (5th Cir. 2016); *U.S. v. Hoang*, 285 Fed. Appx. 133 (5th Cir. 2008).
[2] R. Doc. 86.
[3] R. Doc. 1-1 at ¶¶ 4, 8.
[4] *Id.* at ¶ 4.

issued an insurance policy to Gunite providing uninsured/underinsured motorist coverage, which was in full force and effect at the time of the alleged incident.[5] Plaintiff seeks to recover damages from Starr Indemnity for the injuries he allegedly suffered as a result of the unknown driver's negligence.[6]

Rucoba is a professional engineer licensed to practice in Texas.[7] He received his Bachelor of Science in Mechanical Engineering from the University of Houston in 1984.[8] He has worked as a laboratory technician, project engineer, and senior engineer.[9] As a member of the Society of Automotive Engineers, he has published several technical papers on automobile crashes.[10] According to Rucoba, his expert testimony has been accepted by several courts, including one Louisiana state court.[11] Plaintiff does not attack the qualifications of Robert Rucoba as an accident reconstruction expert. Instead, Plaintiff questions the reliability of Rucoba's opinions in this case because his methodology is not scientifically valid.

Rucoba was retained by Defendant to conduct an accident investigation and reconstruction of Plaintiff's June 25, 2018 accident. Rucoba's opinions are found on the last page of his January 22, 2020 report:

> The likely cause of this crash was driver error on several accounts. First, an unidentified vehicle failed to yield the right of way and pulled out into the travel lanes in front of Meador. Secondly, Meador was driving his loaded gunite truck at a speed in excess of the posted speed limit. Thirdly, the signpost near the unidentified car's starting point is approximately 210 feet <u>east</u> of the first sign of physical evidence. At 67 miles per hour it would take 2.1 seconds before Meador's vehicle reached the first sign of physical evidence. Since Meador testified that he was on the eastern side of that

---

[5] *Id.* at ¶ 7.
[6] *Id.* at ¶¶ 9-10.
[7] R. Doc. 86-9 at 1.
[8] *Id.* at 3.
[9] *Id.*
[10] *Id.*
[11] *Id.* at 1, 6. The Court has not been provided with any pleadings in the referenced Louisiana case and does not know in which area he was allowed to testify, if any.

signpost when he saw the passenger car begin to move, he would have additional seconds, above and beyond the 2.1 seconds, to avoid the car. Stated another way, Meador likely had enough time/distance to use his brakes to safely slow his vehicle down and it was not necessary to swerve off the road. Finally, in response to the vehicle pulling in front him Meador steered his vehicle to right and partially exited the pavement and entered the shoulder. Meador then abruptly steered his vehicle to regain the road rather than first slowing down before steering back onto the road in a controlled manner. This series of events is recognized as the single most common cause of rollover crashes and is one that will cause rollover of all vehicle types. The Louisiana Commercial Motor Vehicle Drivers Handbook provides off-road situational guidelines, "Stay on the Shoulder. If the shoulder is clear, stay on it until your vehicle has come to a stop. Signal and check your mirrors before pulling back onto the road." The vehicle's reentry path confirms that Meador did not follow the Drivers Handbook guidelines.[12]

The opinions expressed by Rucoba may be summarized as:

1) A phantom driver entered the roadway contributing to the cause of the accident;

2) Plaintiff's speeding contributed to the cause of the accident;

3) Plaintiff contributed to the cause of the accident because he had sufficient time and distance to slow down and there was no need for him to swerve off the roadway;

4) Plaintiff failed to comply with recommendations from the Louisiana Commercial Motor Vehicle Driver's Manual because, rather than slowing down on the shoulder and steering back onto the roadway in a controlled manner, he abruptly steered his vehicle back onto the roadway.

Plaintiff argues the opinions of Rucoba, summarized above, should be excluded "because the methods used to construct his expert report are unreliable."[13] In arguing that Rucoba's testimony fails to meet the statutory requirements of Rule 702,[14] Meador offers five arguments: (1) Rucoba did not account for braking factors and relied on an arbitrary distance for the phantom vehicle;[15] (2) Rucoba did not investigate the accident scene until 16 months after the incident and relied on pictures for measurements and observations;[16]

---

[12] R. Doc. 86-9 at 7-20.
[13] R. Doc. 74 at 1.
[14] R. Doc. 74-1 at 4. *See* F. R. Evid. 702.
[15] *Id.* at 4-5
[16] *Id.* at 5-6.

3

(3) Rucoba ran tests with a truck that was significantly heavier and an axle lesser than Plaintiff's truck;[17] (4) Rucoba's findings regarding the Louisiana Commercial Motor Vehicle Driver's Manual (the "Manual") rules are inconsistent with the rules themselves;[18] and (5) Rucoba drew irrelevant or incorrect conclusions from Plaintiff's driving speed.[19]

Starr Indemnity opposes the motion and argues: (1) Rucoba relied on an accurate approximation of the distance for the phantom vehicle;[20] (2) the use of photogrammetric analysis is a commonly accepted methodology;[21] (3) tests were never run and the weight and additional axle of the exemplar truck were never used;[22] (4) the opinions were, in fact, consistent with the Handbook rules;[23] and (5) Plaintiff's speeding with a full cement truck is relevant to the accident.[24]

## **STANDARD**

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert witness testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.[25]

---

[17] *Id.* at 6-7
[18] *Id.* at 7-8.
[19] *Id.* at 8-10
[20] R. Doc. 86 at 7-10.
[21] *Id.* at 10-12.
[22] *Id.* at 12-13.
[23] *Id.* at 13-15.
[24] *Id.* at 15-17.
[25] FED. R. EVID. 702.

4

The United States Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,[26] provides the analytical framework for determining whether expert testimony is admissible under Rule 702.

Under *Daubert*, courts, as "gatekeepers," are tasked with making a preliminary assessment of whether expert testimony is both relevant and reliable.[27] The party offering the expert opinion must show by a preponderance of the evidence that the expert's testimony is reliable and relevant.[28]

The reliability of expert testimony "is determined by assessing whether the reasoning or methodology underlying the testimony is scientifically valid."[29] In *Daubert*, the Supreme Court enumerated several non-exclusive factors that courts may consider in evaluating the reliability of expert testimony.[30] "These factors are (1) whether the expert's theory can or has been tested, (2) whether the theory has been subject to peer review and publication, (3) the known or potential rate of error of a technique or theory when applied, (4) the existence and maintenance of standards and controls, and (5) the degree to which the technique or theory has been generally accepted in the scientific community."[31]

The Supreme Court has cautioned the reliability analysis must remain flexible: the *Daubert* factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony."[32] Thus, "not every *Daubert* factor will be applicable in every situation . . . and a court has

---

[26] 509 U.S. 579 (1993).
[27] *See Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243–44 (citing *Daubert*, 509 U.S. at 592–93).
[28] *Mathis v. Exxon Corp.*, 302 F.3d 448, 459–60 (5th Cir. 2002).
[29] *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007). *See also Burleson v. Texas Dep't of Criminal Justice*, 393 F.3d 577, 584 (5th Cir. 2004); *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584–85 (5th Cir. 2003).
[30] *Daubert*, 509 U.S. at 592–96.
[31] *Bocanegra*, 320 F.3d at 584–85 (citing *Daubert*, 509 U.S. at 593–94).
[32] *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999).

discretion to consider other factors it deems relevant."[33] The district court is offered broad latitude in making expert testimony determinations.[34]

As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight of the evidence rather than its admissibility and should be left for the finder of fact.[35] "Unless wholly unreliable, the data on which the expert relies goes to the weight and not the admissibility of the expert opinion."[36] Thus, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[37] The Court is not concerned with whether the opinion is correct but whether the preponderance of the evidence establishes that the opinion is reliable.[38] "It is the role of the adversarial system, not the court, to highlight weak evidence."[39]

## LAW AND ANALYSIS

### I. Rucoba's opinion that Plaintiff had time to slow down and did not need to swerve off the roadway is not admissible.

Rucoba found the likely cause of the crash was driver error on several accounts. Plaintiff seeks to exclude or limit Rucoba's expert testimony that Plaintiff's driver error is partially responsible for the accident because Plaintiff had sufficient time to safely slow his vehicle down, rather than swerving off the road. Plaintiff argues "the methods [Rucoba] used to construct his expert report are unreliable."[40] To be reliable, the

---

[33] *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 326 (5th Cir. 2004).
[34] *See, e.g., Kumho Tire*, 526 U.S. at 151–53.
[35] *See Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 562 (5th Cir. 2004).
[36] *Rosiere v. Wood Towing, LLC*, No. 07-1265, 2009 WL 982659, at *1 (E.D. La. Apr. 8, 2009) (citing *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 1996)) (emphasis added); *Wolfe v. McNeil-PPC, Inc.*, No. 07-348, 2011 WL 1673805, at *6 (E.D. Pa. May 4, 2011).
[37] *Pipitone*, 288 F.3d at 250 (quoting *Daubert*, 509 U.S. at 596) (internal quotation marks omitted).
[38] *See Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012).
[39] *Primrose*, 382 F.3d at 562.
[40] R. Doc. 74 at 1.

6

testimony must be scientifically valid based on the underlying reasoning and methodology. The Court must determine whether the methodology employed by Rucoba is sufficient to render his opinions relevant and reliable.[41] Defendant, as the proponent of Rucoba's expert testimony, carries the burden of proving the testimony is admissible by a preponderance of the evidence.[42]

To obtain all reports written by Rucoba, Plaintiff propounded Request for Production No. 1, seeking "[a]ny and all reports written by you (or obtained by you) regarding James Meador's claim the subject matter [*sic*]."[43] Rucoba responded his report dated Jan 22, 2020 was produced to Plaintiffs on January 25, 2020.[44] Rule 26 requires expert reports to contain "a complete statement of all opinions the witness will express and *the basis and reasons for them*."[45] The report does not clearly state the basis and reasons for his opinions. In his deposition, Rucoba testified he relied on peer-reviewed sources in support of his analysis.[46] In an effort to acquire the peer-reviewed sources cited by Rucoba in his deposition as the basis for his opinions, Plaintiff's Request for Production No. 3 asked Rucoba to produce "any and all articles or literature relied upon for the above requested report." Rucoba replied by referring Plaintiff "to the attached articles and literature relied upon as well as articles and literature previously produced to Plaintiff on March 9, 2020."[47] Defendant's counsel provided the Court the publications referenced in response to Request No. 3:

---

[41] *Valencia*, 600 F.3d at 424; *Wagoner v. Exxon Mobil Corp.*, 813 F. Supp.2d 771, 799 (E.D. La. 2011). *See also Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999) ("A district court should refuse to allow an expert to testify if it finds that the witness is not qualified to testify in a particular field or a given subject.").
[42] *Mathis v. Exxon Corp.*, 302 F.3d 448, 459–60 (5th Cir. 2002).
[43] R. Doc. 86-10 at 9.
[44] R. Doc. 86-9 at 7-20.
[45] Fed. R. Civ. P. 26(a)(3)(B).
[46] Robert Rucoba Dep. 125:24-126:12.
[47] R. Doc. 86-10 at 10 ("Response to Request No. 3").

1) K.F. Orlowski, et al., *Reconstruction of Rollover Collisions*;
2) Lynn B. Fricke, *Traffic Accident Reconstruction*, The Traffic Accident Investigation Manual (Northwestern University Traffic Institute);
3) American Association of Motor Vehicle Administrators ("AASHTO"), *Louisiana Commercial Driver's License Manual* (2005);
4) American Association of State Highway and Transportation Officials ("AASHTO"), *A Policy on Geometric Design of Highways and Streets* (1994);
5) Paul L. Olson, *Forensic Aspects of Driver Perception and Response* (Lawyers & Judges Publishing Co.);
6) U.S. Dept. of Transportation ("USDOT"), *Driver Performance Data Book* (June 1987).[48]

These articles cover topics such as reconstruction of rollover collisions, coefficients of friction of various roadway surfaces, braking reaction time and distance, and forensic measurements of driver perception-response times.[49] Also included is the Louisiana Commercial Driver's License Manual.[50]

None of these publications was referenced in the Rucoba report; none of these publications expresses the basis and reasons for Rucoba's opinion that Plaintiff had time to slow his vehicle down to avoid swerving off the road; none of these publications explains his methodology in reaching this opinion.[51] Two of these publications—the article by Paul L. Olson,[52] and the report by the U.S. Dept. of Transportation[53]—discuss perception-reaction times of drivers. The USDOT publication is a cover sheet with a "Perception-Reaction Time" chart attached. It is unclear whether the chart attached to the cover sheet is a USDOT publication. In any event, the chart simply lists average perception-reaction times[54] "obtained in a variety of studies." No explanation of the methods by which the average perception-reaction times in the publication were

---

[48] R. Doc. 107-1. The peer-reviewed publications are attached *in globo*.
[49] *Id*.
[50] *Id*. at 11.
[51] Robert Rucoba Dep. 125:24-126:12.
[52] *Id*. at 159.
[53] *Id*. at 161.
[54] *Id*. at 162. In the chart, perception-reaction time is defined as the time elapsing between perception of the stimulus and onset of the driver's response.

8

calculated has been provided, and Rucoba has not explained how these calculations support his opinion that Plaintiff had sufficient time and distance to slow down and did not need to leave the roadway. Neither did Rucoba explain how the Olson article supports his opinion.[55]

The last page of the USDOT publication is a chart with the heading "Meador v. Starr, Carr Engineering, Inc., Overall Speed Analysis."[56] This appears to be a rollover analysis prepared by Rucoba which, so far as the Court can tell, has no relevance to his opinion that the Plaintiff had sufficient time and distance to slow down and did not need to leave the roadway.

The publication by the American Association of State Highway and Transportation Officials entitled A Policy on Geometric Design of Highways and Streets 1994[57] addresses brake reaction time, defined as the interval between the instant the driver recognizes the distance between an object or hazard on a roadway and the instance the driver applies the brakes.[58] In his deposition, Rucoba testified he did not "perform any calculations concerning braking" in this case.[59] Rucoba explained braking distances only come into account when "talking about stopping distances," but "[i]f you're talking about slowing a vehicle down, that's another aspect of the crash."[60] The Rucoba opinion at issue here is that Plaintiff had time to slow down, not that he had time to stop. Rucoba further admitted

---

[55] In fact, it appears any relevance of reaction time would be in rebuttal to the Defendant's expert witness rather than in support of his own opinion. In his deposition, Rucoba testified, "I did not calculate reaction time because we don't know where the first perception-reaction time even begins. But the documents that I pulled together are a typical range of reaction times that are accepted by accident reconstructionists. And I produced that information mainly in response to the perception-reaction time that Mr. Cummings wrote about in his report."
[56] *Id.* at 163.
[57] 57 R. Doc. 107-1 at 155.
[58] R. Dox. 107-1 at 155.
[59] Robert Rucoba Dep. 93:1-7.
[60] Robert Rucoba Dep. 93:21-94:2.

that, if he had done braking calculations in this case, those calculations would take into account braking distances.[61] He testified his opinion that Plaintiff had time to slow his vehicle down sufficiently to avoid leaving the roadway "depends on how much braking [Plaintiff applied]," which is yet unknown to any of the parties and this Court.[62] Rucoba admitted he did not use any braking deceleration rates to arrive at the opinion that Plaintiff had 2.1 seconds to "slow his vehicle down so as to avoid leaving the road."[63]

The remaining publications—Orlowski and Fricke—deal with the reconstruction of rollover incidents and coefficients of friction. These publications are not referenced in Rucoba's report, and he does not explain in his deposition how they support his opinion that Plaintiff had sufficient time and distance to slow down and did not need to swerve off the roadway.

None of the peer reviewed articles provides a methodology or explanation of how Rucoba reached his conclusion concerning the Plaintiff's ability to slow down his vehicle and avoid swerving off the roadway. None of these publications supports Rucoba's opinion that Plaintiff had time to slow the vehicle down to avoid swerving off the road or explain his methodology in reaching his opinion.

When producing the aforementioned publications to the Court, Defendant's counsel represented that Rucoba also relied on "seven (7) peer reviewed publications prepared by Robert Rucoba" to support his opinions.[64] On October 15, 2020,[65] Defendant's counsel provided the following publications authored by Rucoba:

---

[61] Robert Rucoba Dep. 93:21-94:2.
[62] Robert Rucoba Dep. 98:23-25.
[63] Robert Rucoba Dep. 104:13-20.
[64] E-mail from William P. Worsley, Defendant's counsel, to the Court and all counsel (Oct. 14, 2020 04:14 p.m. CDT).
[65] E-mail from the Court to all counsel (Oct. 15, 2020 12:55 p.m. CDT).

1) Robert Rucoba, et al., *A Three-Dimensional Crush Measurement Methodology using Two-Dimensional Photographs*, SAE Technical Paper No. 2008-01-0163 (2008);
2) Robert Rucoba, et al., *Analysis of Axle Shaft Failures for Use in Crash Reconstruction*, SAE Technical Paper No. 2005-01-1193 (2004);
3) Lee Carr, Robert Rucoba, Robert Liebbe, Amanda Duran, *Control Loss Following a Simulated Tired Tread Belt Detachment*, 2012 AHFE Int'l Conference, 1688-97 (July 21-25, 2012);
4) Robert Rucoba, et al., *An Analysis of Driver Reactions to Tire Failures Simulated with the National Advance Driving Simulator (NADS)*, 6th Int'l Driving Symposium on Human Factors in Driver Assessment (June 27-30, 2011);
5) James Walker, Robert Rucoba, Dan Barnes, and Steven Kent, *Brake Vacuum Booster Characterization*, SAE Technical Paper No. 2019-01-0412 (Apr. 2, 2019);
6) Lee Carr, Rubert Rucoba, et al., *EDR Pulse Component Vector Analysis*, SAE Technical Paper No. 2015-01-1448 (Apr. 7, 2015); and
7) Robert Rucoba, et al., *The Effectiveness of the National Advanced Driving Simulator (NADS) in Evaluating the Effect of Tire Tread Belt Detachments*, SAE Technical Paper 2013-01-0467 (Apr. 8, 2013).[66]

The third,[67] fourth,[68] and seventh[69] publications discuss a 2002 University of Iowa study of driver responses to simulated rear tread belt detachment. This study and the related publications have no relevance to the opinions Rucoba expressed in this case. Others support the use of photogrammetry[70] and explain axle shaft failures[71] but fail to offer any support for Rucoba's opinion that the Plaintiff had time to slow down to avoid the phantom driver and did not need to exit the roadway. The methodology employed by Rucoba in determining Plaintiff's driver error is not explained or supported by the publications authored by Rucoba.

Plaintiff's motion in limine is based in large part on the report prepared by Plaintiff's rebuttal expert, Dr. Jeremy Cummings, which was helpful and persuasive. Dr. Cummings pointed out that Rucoba lacked key calculations necessary to support his

---

[66] R. Doc. 107-2. The publications authored by Rucoba are attached *in globo*.
[67] *Id*. at 28.
[68] *Id*. at 40.
[69] *Id*. at 69.
[70] *Id*. at 1.
[71] *Id*. at 14.

11

opinion that Plaintiff had time to slow down and did not need to swerve off the roadway, such as the phantom vehicle's speed, steering input, acceleration rate, and angle as it entered the roadway; the separation distance between vehicles; and the time elapsed between Plaintiff's braking and steering input.[72] Dr. Cummings testified that "for [Rucoba] to give the opinion that [Plaintiff] could have simply applied his brakes and avoided this collision is impossible in this case."[73]

The Defendant argues Rucoba's opinions are not based on sound scientific methodology because Rucoba relied on an arbitrary distance for the phantom vehicle.[74] Dr. Cummings agreed and testified there is "no evidence" the phantom vehicle pulled out 210 feet from Plaintiff's vehicle.[75] An eyewitness, Joseph Pierre, estimated the separation distance was 50 feet between Plaintiff's truck and the phantom driver's vehicle.[76] Dr. Cummings testified that reaching a conclusion without knowing this distance is impossible because the expert needs to know exactly where the phantom vehicle was when it pulled onto the road.[77] Dr. Cummings further testified there were additional missing data points necessary for Rucoba to support his conclusion, including the phantom car's acceleration rate and the phantom car's steering input.[78]

Rucoba's report and his deposition testimony provide no clear explanation of the methodology he used to reach his opinion that Plaintiff had sufficient time to slow down and had no need to swerve off the roadway[79]. Because Rucoba does not explain his

---

[72] R. Doc. 74-5 at 1.
[73] Dr. Jeremy Cummings Dep. 74:18-23.
[74] R. Doc. 74-1 at 4-5.
[75] Dr. Jeremy Cummings Dep. 28:24-29:6.
[76] R. Doc. 86-3, Joseph Pierre, III Dep. 21:13-22:5.
[77] Dr. Jeremy Cummings Dep. 5:8-17.
[78] Dr. Jeremy Cummings Dep. 74:1-8; 74:18-75:5.
[79] Plaintiff also argues Rucoba used an unreliable exemplar truck to run his tests because the exemplar truck was significantly heavier than the one driven by Meador on the day of the accident and the exemplar truck had an additional axle. R. Doc. 74-1 at 6-7. Defendant clarifies that Rucoba did not use an exemplar truck

methodology, he offered no evidence he used a methodology that has been subjected to peer review and publication. Nor did he show he used a methodology that is generally accepted in the scientific community. The Court finds Defendant has not met its burden of proving Rucoba's opinion that the Plaintiff had time to slow his vehicle down and did not leave to leave the roadway is reliable.[80]

## II. Rucoba may testify with respect to whether Plaintiff's actions violated the Louisiana Commercial Motor Vehicle Driver's License Manual.

Rucoba in his report concludes Plaintiff's reentry onto the road from the shoulder was contrary to the guidance found in the Louisiana Commercial Motor Vehicle Driver's Manual (the "Manual").[81]

The Manual is a publication of the American Association of Motor Vehicle Administrators ("AAMVA"), which claims to represent "the state, provincial, and territorial officials in the United States and Canada who administer and enforce motor vehicle laws."[82] The AAMVA publishes the Manual and similar versions for other states as a "comprehensive test preparation resource" for commercial driver's license candidates and ensures they meet "all applicable standards."[83] The Federal Motor Carrier Safety Administration incorporates by reference these particular manuals for the fifty states in

---

to run tests, nor did he rely on any tests in his report or deposition. R. Doc. 86 at 13. Defendant further explains Rucoba relied on the exemplar truck only for the truck's length and width and not for its weight or additional axle. *Id*. Rucoba testified he relied on the actual weight and axle specification of the cement truck driven by Meador. He explained, "I believe that the gross vehicle weight of the subject vehicle, from what I recall from the documentation we were provided, was 50,000 pounds." The Court finds any distinctions between Plaintiff's cement truck and the exemplar truck did not significantly affect Rucoba's opinions.

[80] Plaintiff argues Rucoba's use of photogrammetric analysis impermissibly relies on conditions and measurements which could have been altered in the time between the accident and his inspection. R. Doc. 74-1 at 5-6. The use of photogrammetric analysis may be scientifically valid, but Rucoba's opinion has been excluded and the use of this testimony does not support any admissible opinion.

[81] *See* R. Doc. 107-1 at 11.

[82] American Association of Motor Vehicle Administrators, *About AAMVA*, https://www.aamva.org/about-aamva/ (last accessed Nov. 20, 2020).

[83] American Association of Motor Vehicle Administrators, *AAMVA Commercial Driver's License Manual*, https://www.aamva.org/CDL-Manual/ (last accessed Nov. 20, 2020).

its licensing standards.[84] AAMVA also produces other publications relied upon by state and federal governments for statutory and regulatory purposes.[85] The Manual states, in pertinent part:

> ***2.17.1 – Steering to Avoid a Crash*** Stopping is not always the safest thing to do in an emergency. When you don't have enough room to stop, you may have to steer away from what's ahead. Remember, you can almost always turn to miss an obstacle more quickly than you can stop. (However, top-heavy vehicles and tractors with multiple trailers may flip over.)
>
> . . .
>
> ***2.17.2 – How to Stop Quickly and Safely***
> If somebody suddenly pulls out in front of you, your natural response is to hit the brakes. This is a good response if there's enough distance to stop, and you use the brakes correctly. You should brake in a way that will keep your vehicle in a straight line and allow you to turn if it becomes necessary. You can use the "controlled braking" method or the "stab braking" method.
>
> **Controlled Braking.** With this method, you apply the brakes as hard as you can without locking the wheels. Keep steering wheel movements very small while doing this. If you need to make a larger steering adjustment or if the wheels lock, release the brakes. Re-apply the brakes as soon as you can.
>
> . . .

Rucoba opined that Plaintiff's actions contributed to the cause of the accident because he acted below the standard of care expected of a commercial driver by steering back onto the road rather than by slowing down and safely re-entering the roadway or remaining on the shoulder of the roadway.[86] Rucoba explained Plaintiff should have straightened the vehicle to line up with the pavement to get it under control before eventually reentering the highway, instead of "what he chose to do, which [was] an overcorrection to the left, which ultimately caused the vehicle to go into a broadside—or

---

[84] 49 C.F.R §383.131.
[85] *See U.S. v. Smith*, 519 Fed.Appx. 853, 854-55 (5th Cir. 2013) ("AAMVA also issues the CDLIS State Procedures Manual (the "Manual"), which the federal regulations incorporate, see 49 C.F.R. § 384.107, and the Code Dictionary ("ACD"), which states use to translate traffic offense convictions into a uniform format.").
[86] R. Doc. 86-9 at 19.

into a passenger side slide and overturn."[87] Plaintiff argues the Manual Guideline 2.17.1[88] expressly warns stopping is not always the safest reaction to an emergency, and that Plaintiff acted in accordance with the guidelines by not bringing the cement truck to a complete stop when he did not have enough room to stop.[89] Plaintiff argues he could not have stayed on the shoulder of the roadway because he would have "hit the metal railing that was next to the shoulder."[90] Defendant argues no metal railing exists next to the shoulder at the site of the accident.[91] Defendant further argues Meador had about 41-42 feet of shoulder width to arrive at a controlled stop, in accordance with the Manual Guideline 2.17.2.[92]

The Manual is accepted as an industry standard.[93] In *Mouton v. AAA Cooper Transp.*, the Louisiana Third Court of Appeals upheld a trial court's decision to allow an expert witness to testify on the Manual's requirements after the Manual was admitted into evidence.[94] The expert had opined, "I think that the safer option was what the commercial driver's license manual outlines . . . ."[95] In *Jennings v. Annett Holdings, Inc.*, a federal district court cited relevant guidelines from the Louisiana Manual and its Missouri counterpart when partially denying a motion in limine to prohibit an expert witness from discussing a driver's speeding.[96] Rucoba will be allowed to testify that Plaintiff's actions contributed to the cause of the accident because he acted below the standard of care

---

[87] Robert Rucoba Dep. 110:15-111:2.
[88] R. Doc. 74-10 at 2.
[89] R. Doc. 74-1 at 7.
[90] *Id.* at 8.
[91] R. Doc. 86 at 14.
[92] *Id.* at 15.
[93] *See Hood v. Sellers*, 2018 WL 3429708 (M.D. Pa. July 16, 2018) (explaining the AAMVA commercial driver's manual has been approved by the Federal Motor Carrier Safety Administration for states to use to license commercial drivers). *See also Shewack v. Pa. Dept. of Transp.*, 993 A.2d 916 (Pa. Commw. Ct. Apr. 14, 2010) (relying on the AAMVA Code Dictionary to compare driving offenses among the states).
[94] *Mouton v. AAA Cooper Transp.*, 251 So.3d 516, 529 (La. App. 3 Cir. July 18, 2018).
[95] *Id.* at 525.
[96] *Jennings v. Annett Holdings, Inc.*, 2017 WL 3978388 (E.D. Mo. Sept. 11, 2017).

expected of a commercial driver by steering back onto the road rather than by slowing down and safely re-entering the roadway or remaining on the shoulder of the roadway. Questions as to the bases of this opinion are appropriately addressed through cross-examination at trial. It should be left for the jury to decide the amount of weight the opinion carries.[97]

## CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that Plaintiff's Motion in Limine to Exclude and/or Limit the Testimony of Robert Rucoba is **GRANTED IN PART** and **DENIED IN PART.**[98]

Rucoba will not be allowed to testify that Plaintiff had enough time to slow his vehicle down and did not need to swerve off the roadway.

Rucoba will be allowed to testify that Plaintiff's conduct fell below the applicable standard of care because it violated the guidelines in the Louisiana Commercial Motor Vehicle Driver's License Manual.[99]

**New Orleans, Louisiana, this 1st day of December, 2020.**

　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　**SUSIE MORGAN**
　　　　　　　　　　　　　　　　　　**UNITED STATES DISTRICT JUDGE**

---

[97] *See Louviere v. Black & Decker U.S., Inc.*, No. 1:00-cv-597, 2001 WL 36385828, at *1 (E.D. Tex. Oct. 26, 2001) (citing FED. R. EVID. 702).
[98] On September 8, 2020, Plaintiff requested oral argument on the instant motion in limine. R. Doc. 79. Plaintiff's request is **DENIED**.
[99] There is no real dispute the phantom driver contributed to the cause of the accident and Rucoba will be allowed to testify on this point. In his report, Rucoba opined Plaintiff contributed to the cause of the accident because he was "driving his loaded gunite truck at a speed in excess of the posted speed limit." It is undisputed that Plaintiff was exceeding the posted speed limit. The experts will be allowed to reference this fact.